**SWIFT & COMPANY, Inc. and Armour and Company, Plaintiffs,**

v.

**Don J. WICKHAM, Commissioner of Agriculture and Markets of the State of New York, Defendant.**

United States District Court
S. D. New York.

June 10, 1964.

The complaint alleged that § 193 of the Agriculture and Markets Law and action threatened by the Commissioner under it violated the plaintiffs' rights under the commerce and supremacy clauses of the Federal Constitution and the due process and equal protection clauses of the Fourteenth Amendment. Plaintiffs requested that a three-judge court be called to hear and determine the case pursuant to 28 U.S.C. § 2281. Believing that the case might be within that section, Judge Croake, to whom the application came, caused such a court to be assembled as provided in 28 U.S.C. § 2284. For reasons that will later appear, we think it best to take what might seem the unorthodox course of discussing the merits before we address ourselves to the puzzling question, which the parties have not disputed, whether the case is appropriate for a three-judge court under § 2281.

Section 193, subd. 3 of New York's Agriculture and Markets Law provides:

"All food and food products offered for sale at retail and not in containers shall be sold or offered for sale by net weight, standard measure or numerical count under such regulations as may be prescribed by the commissioner."

When the action was brought, the relevant regulation, § 221.40, stated:

"Meat, poultry and fish shall be sold or offered for sale as food at retail by net weight only." [1]

Neither the statute nor the regulation defines "net weight". The Director of the Bureau of Weights and Measures of the Department testified that he interpreted the regulation, as applied to stuffed turkeys, to require statement of the net weight both of the unstuffed and of the stuffed bird, and that, when asked, he so advised local sealers of weights and measures.

The history of the regulation, promulgated after a hearing by the Commissioner to consider an alternative containing an exception "that stuffed poultry, when plainly labeled as such and with the words 'including stuffing' appearing as part of the net weight marking of the combined poultry and stuffing may be sold or offered for sale by the net weight of the combined poultry and stuffing", leaves little doubt that this was an admissible interpretation of the regulation. We are also confident that, in view of the lack of statutory definition of "net weight", the New York courts would hold a regulation having this effect to be within the authority conferred on the Commissioner specifically by § 193, subd. 3 and more generally by § 196–a. See Mounting & Finishing Co. v. McGoldrick, 294 N.Y. 104, 60 N. E.2d 825 (1945). We further hold that the state has taken and has threatened to take action that will prevent the sale of plaintiffs' turkeys unless they comply with the regulation as so interpreted, overruling the state's unpersuasive contention that plaintiffs have been the victims of uncoordinated but uniform acts by a number of local sealers.

Plaintiffs now weigh the turkeys at their packing plants outside New York after stuffing and immediately before freezing. They do not deny they can adjust their operation so as to comply with the New York regulation as interpreted by the Commissioner, although this would allegedly involve a total of three weighings—one before stuffing, one

---

1. This was incorporated, effective March 1, 1964, in § 221.9(c), which provides:
"Except for immediate consumption on the premises where sold or as one of several elements comprising a ready-to-eat meal sold as a unit for consumption elsewhere than on the premises where sold, all meat, meat food products, poultry (whole or parts) and all seafood except shellfish, offered or exposed for sale or sold, as food shall be offered or exposed for sale and sold by net weight."

after, and another when the giblets have been added and the completed product is placed in a Cryovac bag. Swift's witness testified that 200 birds can be weighed per hour; Armour weighs 300. Two additional weighings would thus take Armour somewhat less and Swift somewhat more than a half minute per bird.[2] Since the birds are frozen immediately after the weighing, there would seem to be no difficulty in plaintiffs' making the extra weighings and affixing the added labels only for the approximate quantity intended for shipment to New York; in any event the record contains nothing to show this would not be practicable.

## I.

◼ The contention that New York's regulation is rendered invalid by the commerce clause alone is not substantial. The Commissioner showed that the stuffing constitutes a considerable portion of the net weight of the stuffed bird and also that there can be significant variations in the weight of stuffing in birds of the same size, even when the processing is done by such reputable packers as the plaintiffs and a fortiori when it is not. Hence a label showing only the net weight of the stuffed bird may not fully inform the buyer what he is getting. Protection of the public against false weights and measures or misleading statements about them is one of the oldest exercises of governmental regulatory power. "The control of weights and measures appears in the Anglo-Saxon laws, and in legislation during the next thousand years." Plucknett, A Concise History of the Common Law (1956), 448 fn. 2. The barons of the 13th cen-

tury considered the subject sufficiently important for mention in the 35th Chapter of Magna Carta.[3] A weighing house where goods brought into and out of the city of New Amsterdam "subject to the measure either of the Skepel or Weight" must be weighed and measured "by the sworn Weighmaster and Measurer," see O'Callaghan, Laws and Ordinances of New Netherland, 174–175 (1868), was established in 1654; the local New York sealers, of whose activities Swift and Armour complain, can be traced back to the Act of June 19, 1703, Laws of the Colony of New York, 554.

◼◼ That the framers of the Constitution did not intend that laws of such ancient vintage in New York and other states[4] must yield to an unexercised national authority in the case of goods coming from outside the state is obvious from the mere statement. But the point is further demonstrated by the provision in Article I, § 10, that "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports and Exports, except what may be absolutely necessary for executing its inspection Laws * * * "—a provision as to which The Federalist thought it enough to say "that the manner in which the restraint is qualified, seems well calculated at once to secure to the States a reasonable discretion in providing for the conveniency of their imports and exports; and to the United States a reasonable check against the abuse of this discretion." The Federalist No. 44. There could hardly be a fitter subject for state inspection than weights, see Patapsco Guano Co. v. Board of Agriculture of North Carolina, 171

2. This is on the assumption that two added weighings are needed. In fact the evidence indicated that, in lieu of the present practice whereby the stuffed bird is weighed after being placed in a Cryovac bag, for which appropriate adjustment is made, it would be possible simply to weigh the unstuffed and the stuffed bird and then add a previously determined weight of the giblets. On this basis only one extra weighing of the bird would be required.

3. "There shall be one measure of wine throughout our whole kingdom, and one measure of ale, and one measure of grain, that is the London quarter, and one width of dyed cloth and of russets and of halbergets, that is two ells within the selvages; of weights, moreover, it shall be as of measure."

4. See, e. g., the Massachusetts Act of 1647, Massachusetts Colonial Laws, pp. 199–200.

U.S. 345, 358, 361, 18 S.Ct. 862, 43 L.Ed. 191 (1898), and the same principle that permits a state to prohibit the sale of articles bearing an improper statement as to weight allows it to insist on statements that it reasonably considers to be proper. It is in no way fatal to a regulation of this sort, which does not operate so as to favor local competitors, that compliance may require out-of-state manufacturers to alter their processes, when this is not unduly burdensome. The Patapsco case and Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182 (1912), are sufficient authority. The claims under the Fourteenth Amendment are so patently baseless that we mention them only to show they were not overlooked.

### II.

In contrast to the lack of merit in plaintiffs' contentions that New York's requirements violate these constitutional provisions, their argument that the Supremacy Clause forbids enforcement of New York's regulation because of the federal Poultry Products Inspection Act of 1957, 21 U.S.C. §§ 451–469, 71 Stat. 441–49, raises most serious issues, to which we now turn.

The Act contains an initial section, 21 U.S.C. § 451, making legislative findings as to the national interest in favor of wholesome poultry products and against unwholesome or adulterated ones, as to the impracticability of inspecting poultry and poultry products that enter into the stream of interstate commerce without also inspecting all poultry and poultry products processed in the same establishment, and as to the importance of protecting "interstate commerce in poultry and poultry products inspected for wholesomeness, from being adversely burdened, obstructed, or affected by uninspected poultry or poultry products" in large metropolitan markets. The second section, 21 U.S.C. § 452, declares it "to be the policy of Congress to provide for the inspection of poultry and poultry products by the inspection service as herein provided to prevent the movement in interstate or foreign commerce or in a designated major consuming area of poultry products which are unwholesome, adulterated, or otherwise unfit for human food." The following sections, 21 U.S.C. §§ 453–456, contain definitions, authorize the designation of major consuming areas within which federal controls will govern local as well as interstate commerce in poultry, and provide for inspection of carcasses and of the premises themselves.

The next two sections, 21 U.S.C. §§ 457 and 458, contain the provisions on which plaintiffs particularly rely. Section 457, entitled "Labeling" provides:

"(a) *Requirements for shipping and immediate containers.*

" * * * Each immediate container of any poultry product inspected under the authority of this chapter and found to be wholesome and not adulterated shall at the time such product leaves the official establishment bear, in addition to the official inspection mark, in distinctly legible form, the name of the product, a statement of ingredients if fabricated from two or more ingredients including a declaration as to artificial flavors, colors, or preservatives, if any, the net weight or other appropriate measure of the contents, the name and address of the processor and the approved plant number of the official establishment in which the contents were processed. * * * The Secretary may permit reasonable variations and grant exemptions from the foregoing labelling requirements in any manner not in conflict with the purposes of this chapter.

"(b) *False or misleading labeling.*

"The use of any written, printed or graphic matter upon or accompanying any poultry product inspected or required to be inspected pursuant to the provisions of this chapter or the container thereof which is false or misleading in any particular is prohibited. No poultry products inspected or required to be inspect-

ed pursuant to the provisions of this chapter shall be sold or offered for sale by any person, firm, or corporation under any false or deceptive name; but established trade name or names which are usual to such products and which are not false and deceptive and which shall be approved by the Secretary are permitted. If the Secretary has reason to believe that any label in use or prepared for use is false or misleading in any particular, he may direct that the use of the label be withheld unless it is modified in such manner as the Secretary may prescribe so that it will not be false or misleading. If the person using or proposing to use the label does not accept the determination of the Secretary, he may request a hearing, but the use of the label shall, if the Secretary so directs, be withheld pending hearing and final determination by the Secretary. Any such determination by the Secretary shall be conclusive unless within thirty days after the receipt of notice of such final determination the person adversely affected thereby appeals to the United States court of appeals for the circuit in which he has his principal place of business or to the United States Court of Appeals for the District of Columbia Circuit."

Section 458 prohibits various acts, including:

"(c) Falsely making or issuing, altering, forging, simulating, or counterfeiting any official inspection certificate, memorandum, mark, or other identification, or device for making such mark or identification, used in connection with the inspection of poultry or poultry products under this chapter, or causing, procuring, aiding, assisting in, or being a party to, such false making, issuing, altering, forging, simulating, or counterfeiting, or knowingly possessing, without promptly notifying the Secretary of Agriculture or his representative, uttering, publishing, or using as true, or causing to be uttered, published, or used as true, any such falsely made or issued, altered, forged, simulated, or counterfeited official inspection certificate, memorandum, mark, or other identification, or device for making such mark or identification, or representing that any poultry or poultry product has been officially inspected under the authority of this chapter when such poultry or poultry product has in fact not been so inspected.

"(d) Using in commerce, or in a designated major consuming area, a false or misleading label on any poultry product."

Pursuant to 21 U.S.C. § 463, the Secretary of Agriculture has issued regulations to carry out the Poultry Inspection Act, the most pertinent of which we quote in the margin.[5]

It is undisputed that the Administrator has approved labels for plaintiffs' frozen stuffed turkeys which show only the net weight of the stuffed bird. In May, 1963, Swift sought approval of a "revised net

---

5. 7 CFR § 81.125:
"Except as may be authorized by the Administrator with respect to shipment of products between official establishments, each shipping container and each immediate container of any product shall at the time it leaves the official establishment bear approved labels containing information in accordance with the provisions set forth in §§ 81.126 to 81.146, inclusive, and the act."
7 CFR § 81.127:
"No label, except printer's proofs bearing official identification shall be printed until the printer's proof or a photostatic copy has been found by the Administrator to be acceptable * * *."
7 CFR § 81.130:
"(a) Each label approved for use on an immediate container for poultry products shall bear in distinctly legible form the following information:
"(1) The common or usual name of the poultry product.
"(2) A statement of ingredients if fabricated from two or more ingredients, including a declaration as to artificial flavors, colors or preservatives, if any. Such ingredients shall be listed by their

weight statement showing separate weight for turkey, dressing and total weight." The Head of the Poultry Products Section, Inspection Branch, Poultry Division, returned the proposed labels with adverse comments. A letter amplified the reasons. These included the impracticability of the consumer's verifying the separate net weights due to absorption of juices by the dressing during defrosting, the possibility that the weight slip attached to the bird at the first weighing might become detached so that wrong weights might be shown, and the danger of bacterial contamination during the time needed for the added weighings. An application by Armour for approval of a label showing separately the net weight of the turkey and of the stuffing but without a total was returned with the comment "The net weight of the poultry product including the stuffing must be shown in lieu of separate net weights." Neither Swift nor Armour requested a hearing as permitted by the statute and the regulations.

### A.

We must first consider whether by the mere enactment of the Poultry Inspection Act, Congress so "occupied the field" as to oust all weight regulation by states into which federally inspected poultry or poultry products are shipped, irrespective of the consistency of the state and the federal regulation. Some illumination is afforded by a series of cases that arose shortly after enactment of the Pure Food and Drug Act. The first, Savage v. Jones, supra, held that the provisions of § 8 prohibiting a package or label that contained false or misleading statements of the contents, 34 Stat. 768, 770 (1906), did not invalidate a state statute requiring a tag or label affirmatively disclosing the ingredients. In contrast, at the next term, the Court decided that when the Secretaries of the

common or usual names in the order of their descending proportions.

"* * *

"(3) The net weight or other appropriate measure of the contents, except that the Administrator may approve the use of labels for certain types of immediate containers which do not bear the net weight: * * * The net weight marked on containers of poultry products shall be the net weight of the poultry products and shall not include the weights of the wet or dry packaging materials and giblet wrapping materials.

"(4) The name and address of the packer or distributor and when the name of the distributor is shown, it shall be qualified by such term as 'packed for,' 'distributed by,' or 'distributors.'

"(5) The official inspection mark.

"* * * * *

"(c) Any label which bears the official inspection mark or any written, printed or graphic matter upon or accompanying any poultry product inspected or required to be inspected pursuant to the provisions of the regulations shall not bear any statement that is false or misleading. If the Administrator has reason to believe that any label in use or prepared for use is false or misleading in any particular, he may direct that the use of the label be withheld unless it is modified in such manner as the Administrator may prescribe so that it will not be false or misleading. If the person using or proposing to use the label does not accept the determination of the Administrator, he may request a hearing, but the use of the label shall, if the Administrator so directs, be withheld pending hearing and final determination by the Administrator. Any person so denied the approval of any label shall be notified promptly of the reasons for the denial. A written application for a hearing with respect to the denial may be filed by said person with the Administrator within 10 days after notice of the denial. Such petition shall state specifically the errors alleged to have been made by the Administrator in denying approval of the label. After consideration of the facts adduced at the hearing, any determination with respect to the matter by the Administrator shall be conclusive unless, within 30 days after the receipt of notice of such final determination, the person adversely affected thereby appeals to the United States Court of Appeals for the Circuit in which he has his principal place of business, or to the United States Court of Appeals for the District of Columbia Circuit. * * *"

Treasury, of Agriculture and of Commerce and Labor, had found that a syrup was not misbranded if labelled "corn syrup with cane flavor", a state could not require cans of the syrup sold at retail to be labelled instead "Glucose flavored with Refiner's Syrup." McDermott v. Wisconsin, 228 U.S. 115, 33 S.Ct. 431, 57 L.Ed. 754 (1913); the Court had no occasion to consider whether the state might require this as an additional label. The trilogy was completed by Corn Products Refining Co. v. Eddy, 249 U.S. 427, 39 S.Ct. 325, 63 L.Ed. 689 (1919), holding that federal approval of labelling as corn syrup did not prevent a state from requiring that the cans also bear a statement of ingredients.

■ Multiplication of references to Supreme Court decisions in this general area would serve no useful purpose; it suffices for the present to cite the last bracketing pair, both decided by the narrowest of margins. Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), sustained California's prohibition of the sale of avocados containing less than 8% of oil by weight, as applied to Florida avocados whose maturity on picking was already controlled by compliance with regulations promulgated by the Secretary of Agriculture with special reference to Florida avocados, and which were certified by a Federal-State Inspection Service pursuant to regulations issued by the Secretary under the Agricultural Adjustment Act, 7 U.S.C. §§ 601 et seq., 48 Stat. 31 (1933). The Court reaffirmed that "The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." 373 U.S. at 142, 83 S.Ct. at 1217. As against this Cloverleaf Butter Co. v. Patterson, 315

U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754 (1942), had prohibited Alabama from seizing packing stock butter, not meeting the state standard, which had been acquired by an Alabama processor for use in manufacturing renovated butter for transportation in interstate commerce under federal regulations, Internal Revenue Code of 1939, §§ 2320–27, 53 Stat. 252. The Florida Avocado Growers majority distinguished Cloverleaf on the basis that "Congressional regulation of one end of the stream of commerce does not, ipso facto, oust all state regulation at the other end," 373 U.S. at 145, 83 S.Ct. at 1218, and pointed to the difference recognized in Cloverleaf "between a confiscation which interferes with production under federal supervision and confiscation after production because of a higher standard demanded by a state for its consumers. The latter type is permissible under all the authorities." 315 U.S. at 162, 62 S.Ct. at 499.[6] This distinction necessarily recognizes that it is not inevitably unconstitutional for a state desiring "a higher standard" for the protection of its consumers to confront a manufacturer in another state with the alternatives of taking steps not required by applicable federal law or not selling his goods in the enacting state.

The general scheme of the Poultry Products Inspection Act does not suggest a Congressional purpose to create an exclusive system of regulation of the marketing of poultry; in particular it does not suggest an intent to oust the states of their historic undertaking to safeguard their people from improper statements of weight. The legislative findings, 21 U.S.C. § 451, and the declaration of policy, 21 U.S.C. § 452, speaking of the need for protection against unwholesome poultry products and of the importance of providing for inspection "to prevent the movement in * * * commerce * * * of poultry products which are unwholesome, adulterated, or otherwise unfit * * *", do not carry the im-

6. The *Avocado Growers* dissenters criticized this statement as a reference to "the uncited 'all the authorities,' which appear to be nonexistent." 373 U.S. at 174, 83 S.Ct. at 1234.

plication that any of these objectives would be frustrated if the states were to impose supplemental regulations, at the end of the stream of commerce, to insure accomplishment of these ends—much less if the receiving states should further regulate a subject which the federal Act touches so slightly as weights. While the Act contains the quoted provisions as to labelling, these are merely incidental to the primary provisions for inspection of poultry products. Passage of the Act did not result from any belief on the part of Congress that there were serious weight or labelling abuses demanding correction; neither the legislative findings nor the declaration of policy make any reference to these subjects. In the entire statute, stretching over nine pages in the Statutes at Large, the sole reference to disclosure of weight consists of one short clause. The House Report, No. 465, 85th Cong., 1st Sess. 1957; 2 U.S. Code Cong. & Adm.News 1957, pp. 1632–33, and the Senate Report, No. 195, 85th Cong., 1st Sess. 1957, say nothing on the subject save for a passing mention of a statement of "the quantity" in paraphrasing the labelling section where this clause appears.

Insofar as plaintiffs contend that the extra weighings needed to meet New York's requirement frustrate the primary Congressional purpose by impairing the wholesomeness of the product, we reject the claim as wholly contrary to the evidence. The weighings would add something like half a minute to the 45 minutes in which the birds are now exposed between their bath in ice slush and their entry into the freezer; Armour's plant superintendent admitted, with commendable candor, that the small additional time and handling would have no adverse effect.[7]

For reasons already indicated in part, we likewise cannot conclude that a state requirement of a more detailed declaration of weights was ruled out by mere enactment of the federal statute. Although the Secretary of Agriculture may have reasonable leeway to determine what net weight shall be shown on the official federal label and the label provisions of the Act recognize the necessity of protecting the integrity of the "official inspection mark" (21 U.S.C. § 453(j)) and contain a normal prohibition of "false and misleading labeling", there is no basis for assuming that any further statement as to weight that a state may require would necessarily affect the integrity of the official inspection mark or be "false or misleading". To borrow from Mr. Justice Brennan's opinion in the Florida Avocado Growers' case, the manner of stating the weight of frozen stuffed turkeys in various markets "seems to be an inherently unlikely candidate for exclusive federal regulation," 373 U.S. at 143, 83 S.Ct. at 1218. There is here a complete absence of the "special and peculiar history" that led the Court to conclude in Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 232, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), that a more pervasive but non-conflicting state regulation must yield to the amended federal Warehouse Act, 46 Stat. 1463 (1931). There is a marked contrast with the importance attached in Campbell v. Hussey, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961), to the expressed intention to establish *uniform* standards in the Tobacco Inspection Act, 49 Stat. 731 (1935). And the problem is in no wise comparable with that in Napier v. Atlantic Coast Line R. R., 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926), where the decision as to the exclusivity of the Boiler Inspection Act must have been influenced

7. It is true that danger of contamination resulting from additional weighings was one of the reasons given in the letter of an official of the Department of Agriculture explaining to Swift the rejection of its labelling proposal. But since this reason was not among those given in the official statement of re-

jection and since there had been no hearings on the subject, this informal comment cannot be taken as an authoritative statement of the Secretary's position. In any event we should be forced to reject it as unsupported by *substantial* evidence.

by the paralyzing effect on railroads from prescription by each state of the safety devices obligatory on locomotives that would pass through many of them. Compare Southern Pacific Co. v. Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945); Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959). Here, as has been noted, plaintiffs will encounter no serious manufacturing problem in conforming to New York's requirements even though the federal authorities and other states have not gone so far. We conclude that plaintiffs cannot prevail on their general argument as to federal occupation of the field.

### B.

 We must thus examine not only the precise language of the Poultry Products Inspection Act but also the regulations issued and actions taken thereunder to determine whether an irreconcilable conflict has arisen between what the United States has commanded and what New York requires. Cloverleaf Butter Co. v. Patterson, supra, 315 U.S. at 155–156, 62 S.Ct. 491; Florida Lime & Avocado Growers, Inc. v. Paul, supra, 373 U.S. at 146, 83 S.Ct. 1210.

We begin by observing that, as we understand New York's position, it does not demand any modification in the weight label adjacent to the Department of Agriculture's official inspection stamp; we shall assume New York would be satisfied, as indeed it must be, so long as somewhere on the container there is a statement of the net weight of the bird before stuffing, on which, if need be, any federal responsibility could be expressly disclaimed. Such a presentation should go a long way toward satisfying the concern expressed in the letter of the Head of the Poultry Products Section of the Department of Agriculture lest an inaccurate statement should occur when an occasional bird, weighed before stuffing,

loses its tag in the process—although we would indeed suppose that a technology that has been able to develop computers, space satellites, and supersonic airplanes could find means to conquer this problem.[8] The federally approved label, adjacent to the inspection mark, thus need contain only what it now contains—a recital of the net weight of the stuffed bird as it enters the freezing chamber.

The question thus becomes whether the United States has prohibited plaintiffs from affixing an additional label that will meet New York's requirements. Reading the statute in the manner prescribed in cases of this sort, we find no "unambiguous congressional mandate to that effect." 373 U.S. at 147, 83 S.Ct. at 1219. Although we assume that the Secretary of Agriculture or his delegate, the Administrator of the Agricultural Marketing Service, is empowered to construe the required statement of "net weight", § 457(a), as referring to the net weight of the stuffed bird, this alone would not outlaw further statements concerning weight so long as these do not obscure or detract from the force of the federally approved label, and so long as they are not presented so as to imply federal approval. Indeed, this view is supported by regulation 81.127, footnote 5 supra, which, although confusingly worded, shows concern only for labels which bear official identification. Consistent with this, we read the communications from the Department as merely rejecting the particular labels submitted for approval and not as attempting to rule broadly that any supplementary labelling of weight in addition to that satisfying the Department would be unlawful.

 Neither can we sustain Swift and Armour on the basis that the communications are a finding that a supplementary label satisfying the demands of the New York Commissioner would in-

---

8. The Department's concern that the purchaser could not precisely verify the statement of weight before stuffing since the stuffing might absorb some of the bird's juices during defrosting would seem a worry more appropriate for New York. Apparently New York has decided that a statement whose policing may require reasonable tolerance is better than none.

evitably be so misleading as to fall within the proscription of the federal statute. When the alleged inconsistency of a state with a federal regulation is not apparent on the face of the two commands but hinges on a factual determination, a citizen desiring freedom from the state regulation does not discharge his burden by obtaining a letter from a subordinate federal official—at least when Congress has laid out a fact-finding procedure as to which the state could be given notice and an opportunity to be heard. Cf. Federal Power Comm. v. Arkansas Power & Light Co., 330 U.S. 802, 67 S.Ct. 963, 91 L.Ed. 1261 (1947), reversing per curiam the decision of the Court of Appeals for the District of Columbia, 156 F.2d 821 (1946). The statute, § 457(b), and the regulations, 7 C.F.R. § 81.130 (c), provide that a person aggrieved by a determination may request a hearing and, if the preliminary determination is then adhered to, may obtain judicial review. Swift and Armour were obliged at least to pursue the former remedy if this was necessary to obtain a clear determination that any label satisfactory to New York would be banned by the federal Administrator as misleading. We think it highly unlikely that upon a departmental hearing, with New York given the notice that proper respect to its authority would demand, anyone could reasonably find that a separate statement of the weight of the unstuffed bird would be false or misleading. To the contrary, we are convinced by the evidence that the additional statement would make the total impression less misleading than simply having a label which, as was testified, in one instance showed a net weight of 7¼ pounds for a stuffed turkey which, after defrosting, was found to contain 2⅛ pounds of stuffing—even if an occasional turkey might unwittingly strut under another's tag.

### III.

We now reach the question, postponed at the outset, whether this is a case seeking an "injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute * * * upon the ground of the unconstitutionality of such statute," 28 U.S.C. § 2281, as to which alone a court of three judges is required. Before March 26, 1962, when the Supreme Court decided Kesler v. Department of Public Safety of Utah, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641, the question would have been speedily answered in the negative. Since the claims that application of the New York statute violates the commerce clause or the Fourteenth Amendment are insubstantial, the serious questions that remain are of federal statutory preemption and of conflict between federal and state enactments; these had not been considered to be claims of "unconstitutionality" within § 2281, even though an elegant statement of the argument would end with a reference to the supremacy clause of Article VI of the Constitution. See Kesler v. Department of Public Safety of Utah, supra, 369 U.S. at 175–176, 82 S.Ct. 807 and fn. 5 (dissenting opinion of the Chief Justice) (1962); Wright, Federal Courts 164 (1963). But, in Professor Wright's language, the Kesler decision qualified "the cases which seemed to so hold with a very subtle rule", namely, that § 2281 was applicable when "no question of statutory construction, either of a state or a federal enactment, is in controversy" so that the case "presents a sole, immediate constitutional question", as distinguished from cases "which presented issues of statutory construction even though perhaps eventually leading to a constitutional question," 369 U.S. at 157–158, 82 S.Ct. at 811.

When we reflect on what we have written, we think we have indeed construed the Poultry Products Inspection Act, both to determine whether it was meant to oust all state regulation of weights *ex proprio vigore* and to decide whether it bans the statement as to weight on which New York insists. If a problem of statutory construction exists

whenever "there is a fair contest between two readings, neither of which comes without respectable title deeds * * * *", Frankfurter, Some Reflections on the Reading of Statutes, in Of Law and Men 45 (1956), it would seem that even under Kesler this was a case for a single judge, although Judge Croake in calling for a three-judge court and the Chief Judge of the Circuit in responding to his call could hardly have been expected to foresee just how the case would develop. But the issue is not that simple. The Kesler case itself required consideration of the purpose and effect of § 17 of the Bankruptcy Act—an issue on which, indeed, the Justices did not agree. The question therefore is not whether we have engaged in construction of a federal statute *simpliciter*, but whether we have engaged in so much more construction than in Kesler as to make that ruling inapplicable.[9] If we were obliged to answer that question, we would say we had. But we see no need to assume a task for which our litmus paper is not sufficiently sensitive to permit an assured answer, and as to which the consequences of a wrong decision in one direction might be so serious. Although a single district judge is without power to act in a case requiring three judges, the opposite is not true, Phillips v. United States, 312 U.S. 246, 254, 61 S.Ct. 480, 85 L.Ed. 800 (1941); Public Service Comm. of Missouri v. Brashear Freight Lines, Inc., 312 U.S. 621, 626, 61 S.Ct. 784, 85 L.Ed. 1083 (1941).[10] Since a return of the case to Judge Croake would result in an invalid order if the return was erroneous, whereas the only consequence of erroneous retention of jurisdiction by the three-judge court is that the appeal should be taken to the Court of Appeals rather than to the Supreme Court, an uncertainty against which the plaintiffs may protect themselves by timely appeals to both courts, see also Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Turner v. City of Memphis, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962), we direct that judgment dismissing the complaint be entered in the name of the three-judge court, at the same time certifying out of abundant caution that Judge Croake individually arrived at the same conclusion that we have reached collectively.

The complaint is dismissed.

9. United States v. Georgia Public Service Comm., 371 U.S. 285, 287, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963), in which the Court requested counsel to brief and argue the applicability of Kesler, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962), went off on the point that the case presented a substantial question of conflict with the Constitution itself. See also Borden Co. v. Liddy, 309 F.2d 871, 874 (8 Cir. 1962), cert. denied, 372 U.S. 953, 83 S.Ct. 951, 9 L.Ed.2d 977 (1963), and Note, The Three-Judge District Court: Scope and Procedure under Section 2281, 77 Harv. L.Rev. 299, 313–315 (1963), criticizing the Kesler decision.

10. It is not altogether plain whether the rationale is that the two additional judges are surplus, see Healy v. Ratta, 67 F.2d 554, 556 (1 Cir. 1933), reversed on other grounds, 292 U.S. 263, 54 S.Ct. 700, 78 L. Ed. 1248 (1934); O'Malley v. United States, 128 F.2d 676, 687 (8 Cir. 1942), rev'd on other grounds, 317 U.S. 412, 63 S.Ct. 268, 87 L.Ed. 368 (1943), a theory that would create problems if the district judge to whom the application was initially presented was in disagreement; cf. Cannonball Transp. Co. v. American Stages, Inc., 53 F.2d 1050 (D.C., S.D. Ohio 1931); United States v. Query, 37 F.Supp. 972, 977 (D.C., E.D.So.Car.), aff'd 121 F.2d 631 (4 Cir.), cert. denied, 314 U.S. 685, 62 S.Ct. 295, 86 L.Ed. 548 (1941), cert. granted, 316 U.S. 653, 62 S. Ct. 1036, 86 L.Ed. 1733, vacated and remanded, 316 U.S. 486, 62 S.Ct. 1122, 86 L.Ed. 1616 (1942); or that the three judges are sitting as a district court *in banc*, 28 U.S.C. § 132, see International Longshoremen's and Warehousemen's Union v. Ackerman, 82 F.Supp. 65, 93–94 (D.C.Hawaii, 1948), rev'd on other grounds, 187 F.2d 860 (9 Cir. 1951); and Wilson & Co. v. Freeman, 179 F. Supp. 520, 524 (D.C.Minn.1959); or something else.