L & L STARTED PULLETS, INC., Avian Bates Farms, Inc., Mountain Pride Farmers, Inc., a wholly owned subsidiary of Intercounty Farmer Co-Operative Association, a New York cooperative association, class plaintiffs, for themselves and on behalf of a class similarly situated and the Grand Union Company, a Delaware Corporation, Plaintiffs,

v.

Simon P. GOURDINE, as Commissioner of Department of Consumer Affairs of City of New York, and The City of New York, Defendants.

No. 83 Civ. 5394(ADS).

United States District Court, S.D. New York.

July 13, 1984.

Orseck, Orseck & Greenberg, Liberty, N.Y., for plaintiffs; Gerald Orseck, Liberty, N.Y., of counsel.

Frederick A.O. Schwarz, Jr., Corp. Counsel of the City of New York, New York City, for defendants; Joseph I. Laver, Gary R. Tarnoff, Dale C. Kutzbach, Kristin Helmers, Howard S. Weiss, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

SOFAER, District Judge:

Three of the four "named" plaintiffs in this action are New York corporations which own and operate egg farms in Sullivan County, within the Southern District of New York. They are allegedly members of a class in excess of 100 members, each member of which owns and operates an egg plant, as approved by the United States Department of Agriculture (hereinafter "USDA"), located in the states of New York, New Jersey, Connecticut, and Pennsylvania. The Grand Union Company is a multistate Delaware Corporation that sells class members' eggs to the consuming public. Plaintiffs and defendants have crossmoved for summary judgment pursu-

ant to Rule 56 of the Federal Rules of Civil Procedure. The material facts are not in dispute and for the reasons that follow defendants' motion is granted.

## I. *The Federal Scheme of Regulation.*

Plaintiffs' eggs are produced at plants subject to federal inspection pursuant to the United States Agriculture and Marketing Act of 1946. (7 U.S.C. § 1621 *et seq.*) Section 1622(h) of this Act authorizes the Secretary of Agriculture to establish a program of inspection, certification, and identification of the class, quality, quantity, and condition of agricultural products. It also provides that any official certificate or mark issued under the authority of the USDA "shall be received by all ... courts of the United States as prima facie evidence of the truth of the statements therein contained." (7 U.S.C. § 1622(h)) The Act specifically provides, however, that no person is required to use the service authorized by this subsection. Regulations have been promulgated to implement this voluntary federal inspection program and are codified in 7 C.F.R. Part 56, in which a table with minimum net weight requirements for each class of eggs is set forth. (7 C.F.R. § 56.218) The regulations also provide, in relevant part, that "compliance with the Regulations of [7 C.F.R. Part 56] shall not excuse failure to comply with any federal, state, or municipal applicable laws or regulations," 7 C.F.R. 56.8 even though state officials (including the defendants in this case) have the right to participate in the grading process at all official plants. 7 C.F.R. § 56.6.

Federal law governing inspection and labeling of plaintiffs' eggs is contained in three additional sources. The Federal Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, deals with various aspects of the marketing of food products, including shell eggs. Section 343, entitled "misbranded food," requires food in package form to bear a label containing the name and place of business of the manufacturer, packer or distributor; and an accurate statement of the quantity of the contents in terms of weight, measure, or nu-

merical count. Reasonable variations from the stated quantity of the contents, caused by loss or gain of moisture during the course of good distribution practice, are allowed. (Kutzbach Affidavit ¶¶ 37–38). The Fair Packaging and Labeling Act, 15 U.S.C. January 3, 1984, §§ 1451–1461, prescribes the placement, form, and contents of statements of quantity on the labels of packaged goods, including eggs. Section 1461, entitled "Effect upon State Law" states:

> It is hereby declared that it is the express intent of Congress to supersede any and all laws of the States or political subdivisions thereof insofar as they may now or hereafter provide for the labeling of the net quantity of contents of the package of any consumer commodity covered by this chapter which are less stringent than or require information different from the requirements of section 1453 of this title or regulations promulgated pursuant thereto. 15 U.S.C. § 1461.

Finally, the Shell Egg Graders Handbook of the Poultry and Dairy Division, Food Safety and Quality Service, U.S. Department of Agriculture, contains detailed information on the technical aspects of the voluntary egg inspection program, and states that it is "the responsibility of management to pack eggs which will meet grade requirements at destinations." (Defendants' 3(g) Statement ¶ 13)

USDA inspectors weigh and grade plaintiffs' eggs at plaintiffs' plants. When eggs are found to be in compliance with USDA requirements, an official seal is affixed to each inspected carton. (7 C.F.R. § 56.36). The eggs are weighed and graded by "continuous grading" performed on a resident basis. (7 C.F.R. § 56.52) This means that at least one USDA inspector is present at each of the plaintiffs' respective plants at all times. The costs of this service to the Department of Agriculture are reimbursed in full by each plaintiff. (7 C.F.R. § 56.52) After plaintiffs' eggs are inspected, graded, weighed, and stamped they are sold and shipped in interstate commerce to various

distributors and retailers, some of which are in the City of New York, including the plaintiff Grand Union. All of plaintiffs' eggs travel through the state of New Jersey en route from plaintiffs' official plants to the City of New York. (Batinkoff Affidavit ¶ (K)) Under the federal scheme any interested party dissatisfied with the determination by a grader of the class, quality, quantity, or condition of any product may request a review of the grader's decision by the grader's immediate supervisor. (7 C.F.R. §§ 56.60, 56.61)

## II. *The State/City Scheme of Regulation.*

Pursuant to Chapter 64 of the New York City Charter (§ 2203(b)), the Commissioner of Consumer Affairs is empowered to enforce all laws regarding weights and measures. The majority of these laws enforced by the Commissioner of Consumer affairs are found in Chapter 36, Title A of the Administrative Code of the City of New York (§ 833–1.0 *et seq.*), known as the "City Department of Markets Law." Section 833–16.0 of the City Department of Markets Law forbids the sale of short-weight products, including eggs. The Commissioner of Consumer Affairs has adopted regulations establishing minimum weights for various grades of eggs, in accordance with his authority under § 833–3.-1(a) of the City Department of Markets Law. (Kutzbach Affidavit ¶¶ 6–9)

The City regulations also contain a table incorporating the standard terms, weights, and sizes to be met in grading eggs. (*Id.* ¶ 9) In determining whether eggs are shortweight, the Department of Consumer Affairs permits an allowance for moisture loss which may occur during the course of good distribution practice. The regulations describe an "unreasonable minus error" below stated net weight at which a package of one dozen eggs is considered in violation as a matter of law. A package of one dozen eggs labeled as "small", "medium", or "large" is considered in violation by the Department of Consumer Affairs only if it is ⁶/₁₆ of an ounce or more below the required weight for the labeled weight class.

A package of one dozen eggs labeled as "extra large" or "jumbo" is considered in violation by the Department of Consumer Affairs only if it is ⁷/₁₆ of an ounce or more below the required weight for the labeled weight class. (Rosenthal Affidavit ¶ 5).

In addition to the power conferred upon the Commissioner of Consumer Affairs by the City Department of Markets Law, the Commissioner is empowered to enforce certain state laws relating to the regulation of egg weights in the City of New York. Specifically, he is empowered to enforce the provisions of Article 16 of the New York Agriculture and Markets Law, known as the "State Weights-and-Measures Law", and the rules and regulations promulgated thereunder. (Kutzbach Affidavit ¶¶ 10–13). Section 194(1) of the State Weights-and-Measures Law, entitled "False labels", proscribes the use and sale of false labels to describe the products which are being offered for sale. Regulations implementing the State weights and measures law also permit "reasonable variations [from stated net weight] caused by loss or gain of moisture during the course of good distribution practice or by unavoidable deviations in good manufacturing practice." *See* New York Code of Rules and Regulations (N.Y. C.R.R.) 221.10.

At least two factors cause packaged eggs to be found short in weight. First, moisture loss causes fresh eggs to lose weight progressively after laying. Refrigeration can lessen but not eliminate this shrinkage during transit and storage. Second, egg cartons are not sealed and consumers switch eggs from cartons containing for instance medium sized eggs, and replace them with jumbo sized eggs. (Complaint ¶ 13). As a result cartons bearing labels for jumbo sized eggs can actually contain medium or smaller sized eggs.

Defendants' enforcement program regarding the weights of eggs sold by retail merchants to the consuming public is carried out by inspectors of the Department of Consumer Affairs who perform routine, daily inspections of retail food stores located in the City of New York to determine

whether packaged goods, including eggs, are being offered for sale at the stated net weight, in compliance with applicable state and local laws. If a packaged commodity is discovered, upon such inspections, as being offered for sale at less than its stated net weight, a PC [Package Control] Notice of Violation is issued to the retailer. The PC Notice requires the retailer to appear for a conference at the Department of Consumer Affairs at a specified date and time, regarding the alleged violation. Failure to appear will result in an assessment of penalties at the maximum amount allowed by law, the collection of which is delegated to the Department's collection agencies. If the agency is not successful in collecting the outstanding penalties, action will be commenced upon the alleged PC Notices of Violation. Procedures have been created to allow for appeal and review of the Notices of Violations, to determine whether the allegedly shortweight packages recorded by field inspectors constitute violations. The review is conducted by the Adjudication Division of the Department of Consumer Affairs. If, upon review of the original Notice of Violation, a package is determined to fall within the permitted deviation, the shortweight charge with respect to that package is dismissed. (Rosenthal Affidavit ¶¶ 3, 11)

Inspectors of the Department have issued PC Notices of Violation to retail merchants in the City of New York for egg shortweights according to the aforestated procedures. At no time, however, has a PC Notice of Violation been issued to or served upon the egg-producer plaintiffs. Defendants have never asserted that producer plaintiffs are legally responsible for shortweight eggs. Plaintiffs allege, however, that numerous "Notices of Violations" have been issued by defendants against Grand Union, based upon findings of shortweight eggs resulting from defendants' reweighing of plaintiffs' eggs at Grand Union's stores, even though the eggs have already passed the weight tests conducted by USDA inspectors at the producers' plants. Plaintiffs allege that substantial fines are imposed for violations found upon these reweighings, and that the class of egg producers, although not fined directly, are forced ultimately to bear the burden of these fines because they are unable to resist the procedure retailers have adopted, when cited by defendants for shortweight violations, of paying the fines and deducting the amount lost from plaintiffs' next invoices. This indirect burden probably deprives plaintiffs of standing to sue. *See* Defendants Memorandum of Law in Support of their motion for Summary Judgment, at 12–18. But the joinder of the Grand Union Company, a retailer who is directly fined by the defendants' enforcement of state and city regulations, makes a decision on the standing issue unnecessary.

### III. *Alleged Preemption.*

Plaintiffs assert that, because several federal laws operate in the field of inspection and labeling of eggs at production facilities, Article VI, cl. 2 of the Constitution, which states that federal law "shall be the supreme law of the land," preempts state and local weights-and-measure laws regarding eggs sold at retail and prohibits the City of New York from enforcing such laws. Plaintiffs fail adequately to recognize, however, that specific subjects of regulation have traditionally been delegated to the states as within their legitimate police powers. The "protection of the public against false weights and measures or misleading statements about them is one of the oldest exercises of governmental regulatory power," *Swift and Co. v. Wickham,* 230 F.Supp. 398, 402 (S.D.N.Y.1964), *aff'd* 364 F.2d 241 (2d Cir.1966), *cert. denied,* 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967); *General Mills, Inc. v. Furness,* 398 F.Supp. 151, 153 (S.D.N.Y.1974), *aff'd mem.,* 508 F.2d 836 (2d Cir.1975), and is one of the "historic police powers of the States," *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 146, 83 S.Ct. 1210, 1219, 10 L.Ed.2d 248 (1963). Where the police power is involved courts have shown great deference to state laws and have been reluctant to allow preemption unless a clear and manifest preemptive intent of Congress is shown. *Ray v. Atlan-*

*tic Richfield Co.,* 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). "This assumption provides assurance that the 'federal-state balance', *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971), will not be disturbed unintentionally by Congress or unnecessarily by the courts," *Jones v. Rath,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Thus, preemption may not be inferred merely on the basis of a federal statute's complexity or comprehensiveness. *Cf. New York State Department of Social Services v. Dublino,* 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688 (1973). A conflict will be found between state and federal law only "where compliance with both federal and state regulations is a physical impossibility . . . ." *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. at 142–43, 83 S.Ct. at 1217–18; or where the local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

▇▇▇ The inspection and labeling of consumer bought eggs falls within the historic police powers of the state. Therefore, to prevail plaintiffs must show either a clear and manifest congressional intent to invalidate all state and city laws within this field of regulation, or that the federal scheme of regulation actually conflicts with the state and city scheme. Plaintiffs have failed to establish either of these bases for preemption.

### A. *Congress did not Intend Preemption.*

The United States Agriculture and Marketing Act of 1946, 7 U.S.C. § 1622(h) explicitly states that " . . . no person shall be required to use the service [federal inspection and certification of products in interstate commerce] authorized by this subsection." Moreover, the regulations implementing this optional inspection program explicitly declare that state and city laws are not preempted. The relevant regulation states that "Compliance with the regulations in this part shall not excuse failure to comply with any other Federal, or any State or municipal laws or regulations." (7 C.F.R. § 56.8). In *DeCanas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), the Supreme Court held that California's regulation of the employment of aliens was not preempted by federal law, emphasizing a provision in the Farm Labor Contractor Registration Act quite similar to the explicit anti-preemption statement in 7 C.F.R. § 56.8, 424 U.S. at 361, 96 S.Ct. at 939. Justice Brennan, writing for the Court, stated: "Of particular significance to our inquiry is the further provision that this chapter and the provisions contained herein are *intended to supplement state action* and compliance with this chapter shall not excuse anyone from compliance with *appropriate state law and regulation.*" *Id.* at 361–62, 96 S.Ct. at 939–40 (emphasis in original).

The "Shell Egg Grader's Handbook," a publication of the Poultry and Dairy Quality Division, Food Safety and Quality Service of the United States Department of Agriculture, contains further evidence that preemption was not intended. The handbook has "detailed information and explanations concerning technical aspects of the voluntary shell egg grading program," repeats verbatim 7 C.F.R. § 56.8, and continues in pertinent part to make it "the responsibility of management to pack eggs which will meet [State Shell Egg] grade requirements at destination." (Kutzbach Affidavit, Ex. 8, p. 2) Such an official interpretation of the federal inspection program by the agency or officers charged with its administration should be given "great deference." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *cf., Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

Finally, the Agriculture and Markets Act offers strong guidance on this issue. It states as one of its goals: "The Secretary of Agriculture is directed and authorized . . . . to inspect, certify and identify the class, quality, quantity and condition of

agricultural products when shipped or received in interstate commerce .... to the end that ... *consumers may be able to obtain the quality product which they desire....*" 7 U.S.C. § 1622(h) (emphasis added). The Act's objective is to enable the consumer to purchase quality eggs, not to provide the most convenient inspection and labeling process for producers and retailers. Similarly, state and local laws which provide for inspection of egg weights immediately prior to retail sale serve to further Congress' aim of protecting consumers. Eggs which meet inspection and labeling requirements at the starting point of the distribution continuum will not necessarily meet minimum standards when they reach the point of retail sale at the end of the distribution continuum. Congress, by affirmatively indicating its concern for the consumer, evidenced an intent to allow defendants to enforce laws and regulations that help ensure compliance with weights and measure standards at the most critical stage from the consumer's standpoint—that of retail sale.

### B. *Federal, State and Local Laws are Consistent.*

Plaintiffs argue that defendants' laws and regulations stand as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Jones v. Rath Co.*, 430 U.S. at 540–541, 97 S.Ct. at 1317–1318 (quoting *Hines v. Davidowitz*, 312 U.S. at 67, 61 S.Ct. at 404), and are therefore in conflict with the federal scheme of regulation. They support this contention with a single authority, *Jones v. Rath*, 430 U.S. 519, 97 S.Ct. 1305, and focus solely on one statute, the Fair Packaging and Labeling Act, 15 U.S.C. §§ 1451–1461 (1967), (hereinafter, "FPLA").

In *Jones,* the State of California attempted to reweigh flour which had been weighed and packaged under federal standards. The Court held that the objectives of the FPLA were unconstitutionally burdened by California's attempts to conduct reweighing inspections at the destination points of packaged flour and to punish noncompliance with the state's inspection standards with civil and criminal prosecutions. The Court reasoned that California's reweighing inspections would force distant manufacturers, unsure of the destination of their flour, to overpack their packages by raising the normal percentage of flour content and lowering the corresponding percentage of water content, to compensate for moisture loss that often accompanies distribution. Local manufacturers serving limited areas, however, could avoid overpacking by adjusting their packing practices to the specific humidity condition (the determinative factor in moisture loss levels) of their region. Thus a manufacturer in an area where the humidity is usually higher than 60%, the point at which flour gains moisture, would not have to overpack at all. Similarly, manufacturers who distributed to states where only the federal regulations prevailed would also avoid the necessity of overpacking. This outcome, the Court concluded, frustrated the purpose of the FPLA: to facilitate value comparisons among similar products. Overpacking resulted in identically labeled packages which in fact varied in the amount of flour solids they contained, thus preventing accurate consumer value comparisons. The clear purpose of FPLA rendered this result constitutionally impermissible. 430 U.S. at 542–43, 97 S.Ct. at 1318–19.

A crucial distinction exists, however, between *Jones v. Rath* and the present case. In *Jones* the Court emphasized California's "... refusal to permit reasonable weight variations resulting from loss of moisture during distribution ..." 430 U.S. at 542, 97 S.Ct. at 1318. Indeed, it noted a causal relationship between the state's refusal to permit such variations and frustration of the "purposes and objectives" of the FPLA, which allows for specified reasonable variations. *See id.* at 537–538, 542, 97 S.Ct. at 1315–1316, 1318. Here, by contrast, reasonable weight variations are explicitly allowed. The City of New York permits variation from stated net weight on cartons of eggs for unavoidable loss of moisture during the course of good distribution practice. 1 N.Y.C.R.R. § 221.10 (Rosenthal Affidavit ¶ 4). The City's pro-

gram therefore does not stand as "an obstacle to the accomplishments and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. at 67, 61 S.Ct. at 404.

Furthermore, the reasonable variations allowed under State and City regulations make compliance with the federal, State and City regulations physically possible, contrary to plaintiffs' contentions. Indeed, the City Department of Markets Law adopts the minimum net weight requirements adopted under the federal scheme pursuant to 7 C.F.R. § 56.218. (*See* Kutzbach Affidavit ¶ 14) This similarity of weight requirements forms a foundation for consistency between the federal and local regulations. The City has also established an allowance for moisture loss during the course of good distribution practice termed the "unreasonable minus error," which when applied to the minimum net weight allowed for each egg size category gives manufactures a fair margin of error. A tolerance for unavoidable manufacturing or production deviations is permitted by not requiring each individual egg within the package of one dozen eggs to weigh precisely $\frac{1}{12}$ of the stated "minimum net weight per dozen." 3.3% of the individual eggs are permitted to be in the next lower weight class as long as the net weight per dozen meets its appropriate per dozen weight requirement. (Conners Affidavit ¶ 14) In sum, the City has established a sufficiently flexible and tolerant scheme of regulation which avoids any real conflicts with the federal scheme and allows for consistency between the two.

Plaintiffs recognize that a problem of shortweight eggs exists. They claim that factors other than moisture loss, such as poor distribution and handling practices by distributors and retailers, and the switching of eggs by consumers, account for the violations city inspectors find at the point of sale. (Complaint ¶ 13) Yet, the sweeping relief plaintiffs seek would disable the City from protecting its citizens against purchasing shortweight eggs. That the producer plaintiffs permit the responsibility for shortweight eggs to be shifted upon themselves from retailers has no bearing on the issue of the validity of local shortweight laws and the protection they afford consumers.

■ The State and City of New York have a right to exercise their police powers to enforce laws and regulations which protect the health and safety of their consuming public. *See Swift and Co. v. Wickham,* 230 F.Supp. 398, 402 (S.D.N.Y.1964); *General Mills, Inc. v. Furness,* 398 F.Supp. 151, 153 (S.D.N.Y.1974); *aff'd mem.,* 508 F.2d 836 (2d Cir.1975); *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 146, 83 S.Ct. 1210, 1219, 10 L.Ed.2d 248 (1963). Moreover, the State/City scheme of regulation encourages better distribution and handling practices throughout the stream of commerce and fosters greater retailer surveillance over the switching of eggs by consumers. These effects of the State and City laws and regulations are completely consistent with the "full purposes and objectives of Congress," *Hines,* 312 U.S. at 67, 61 S.Ct. at 404, which, as illustrated above, seek to protect and provide for the consumer.

### IV. *Alleged Interference with Interstate Commerce.*

Plaintiffs do not explicitly raise the issue of interstate commerce in their complaint or memorandum of law accompanying their motion for summary judgment. The affidavit of Barry Batinkoff in support of that motion, however, and plaintiffs' statement of facts pursuant to Local Rule 3(g), are replete with references to alleged interstate commerce activity by plaintiffs. (Batinkoff Affidavit ¶¶ 2(i), (k) and 8; Plaintiff's 3(g) statement ¶¶ 5, 7, 8(j), 9(c) and 9(d)) Defendants prudently argued this issue in their memorandum of law, and a ruling on the question is therefore appropriate.

■ As in the preemption analysis above, State regulations that affect interstate commerce are presumptively valid where they are exercises of traditional police powers. "[T]he states have always

possessed a legitimate interest in 'the protection of ... [their] people against fraud and deception in the sale of food products' at retail markets within their borders." *Florida Lime and Avocado Growers v. Paul,* 373 U.S. 132, 144, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963), *quoting Plumley v. Massachusetts,* 155 U.S. 461, 472, 15 S.Ct. 154, 158, 39 L.Ed. 223 (1894). Moreover, the regulation of weights-and-measures specifically has been upheld as being within the province of legitimate city regulation. *General Mills v. Furness,* 398 F.Supp. 151 (S.D.N.Y.1974), *aff'd mem.,* 508 F.2d 836 (2d Cir.1975):

> The City [of New York] has a legitimate interest in regulating weights and measures even though its regulations may inevitably require out-of-state packagers to alter their practices to conform to the local standards. So long as the City acts reasonably such regulations do not unnecessarily burden interstate commerce.

398 F.Supp. at 154.

█ Under these standards plaintiffs' commerce-clause challenge fails. The inspection and labeling of consumer egg weights-and-measures is within defendants' exercise of its legitimate police powers, and the City's well established procedures for review and appeal of Notices of Violation meet the requirement of reasonableness set forth in *General Mills.*

Generally, local laws successfully challenged under the rubric of the commerce clause involve economic protectionism by one state against its neighboring states. *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 448, 80 S.Ct. 813, 818, 4 L.Ed.2d 852 (1960); *City of Philadelphia v. State of New Jersey,* 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2535–36, 57 L.Ed.2d 475 (1978). Plaintiffs attempt to bring themselves within this category of cases by alleging that local producers who serve limited areas can more easily adjust their packing practices to the specific humidity conditions of their region than can egg producers with national marketing areas and unknown destination points. Thus, they suggest New York laws favor local New York egg producers and are protectionist in nature.

The City and State regulations challenged here, however, are applied evenhandedly to egg producers within and without New York as well as to producers from several states and from various regions of the country. Furthermore, variations in egg weights can result from causes other than humidity conditions. Bad distribution practices, temperature levels in transporting vehicles, and consumer egg switching are examples of such causes. New York producers are subject to these causes in essentially the same ways as are non-New York producers.

In a commerce clause case involving the validity of a New York State Agriculture and Markets Law regulation, challenged on the grounds that it conflicted with the Federal Poultry Products Inspection Act, Judge Friendly enunciated a principle fully applicable here:

> [I]t is not inevitably unconstitutional for a state desiring "a higher standard" for the protection of its consumers to confront a manufacturer in another state with the alternatives of taking steps not required by applicable federal law or not selling goods in the enacting state.

*Swift and Co. v. Wickham,* 230 F.Supp. at 406 (S.D.N.Y.1964). Here, New York does not desire a higher standard than the federal laws provide, but seeks only to ensure that the federal standard is maintained throughout the distribution and retail process. This exercise of police power to protect New York consumers does not impermissibly interfere with interstate commerce.

## V. Claims Under 42 U.S.C. § 1983 and § 1988.

Plaintiffs allege that, due to the enforcement of City and State laws pertaining to egg weights against retailers defendants have violated and continue to violate their federal rights. They claim therefore that, pursuant to 42 U.S.C. § 1983 they are entitled to injunctive relief, and that, under 42 U.S.C. § 1988, they are entitled to reim-

bursement of reasonable counsel fees. (Complaint ¶¶ 3(a), 22.)

 Section 1983 does not, however, independently create or secure any substantive rights; it merely authorizes a cause of action maintainable in federal court when rights established by another source have been infringed. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 617–18, 99 S.Ct. 1905, 1915–16, 60 L.Ed.2d 508 (1979). Plaintiffs have failed to show that City or State enforcement of laws against egg shortweights violates any right, privilege, or immunity guaranteed to them by federal law. The federal statutes and regulations governing the inspection and labelling of consumer eggs do not establish any such right, privilege, or immunity to benefit or protect plaintiffs. Rather, the federal statutes at issue subject plaintiffs to federal regulation in a legislative effort to protect consumers. At best, plaintiffs' claim could arguably be based upon the theory that they have been deprived of property without due process of the law. But the extensive standards provided for by both the federal and local regulatory schemes, coupled with the opportunity provided for review and appeal of the City's "Notices of Violation", refute any due process claim. Similarly, section 1988 has been interpreted as not creating any substantive cause of action for violation of federal civil rights. *See, e.g., Veres v. County of Monroe,* 364 F.Supp. 1327 (E.D.Mich.1973), *aff'd mem.,* 542 F.2d 1177 (6th Cir.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977).

### VI. *Conclusion.*

For the reasons stated above, New York State and City laws and regulations are not preempted by the federal scheme of regulation for the inspection and labeling of consumer shell grade eggs; New York State and City laws and regulations do not constitute an impermissible interference with interstate commerce; and 42 U.S.C. §§ 1983 and 1988 afford no relief to plaintiff. Defendants' motion for summary judgment pursuant to Rule 56 is therefore granted, and the complaint is dismissed with prejudice and costs.

SO ORDERED.