436 F.2d 115
 Charles F. MILLER
v.
Victor W. ANCKAITIS, Secretary of Transportation of the
Commonwealth ofPennsylvania and Frank McCormick, Supervisor
Financial Responsibility DivisionBureau of Traffic Safety of
the Commonwealth of Pennsylvania, Appellants.
 No. 18379.
 United States Court of Appeals, Third Circuit.
 Argued April 20, 1970, Reargued Oct. 13, 1970.
Decided Dec. 7, 1970.
 
 Robert Baer Cohen, Sp. Asst. Atty. Gen., Philadelphia, Pa., William C. Sennett, Atty. Gen., Harrisburg, Pa., for appellants.
 David H. Kubert, Philadelphia, Pa., for appellee.
 Argued April 20, 1970 Before GANEY, VAN DUSEN and GIBBONS, Circuit Judges.
 Reargued Oct. 13, 1970 Before HASTIE, Chief Judge, and GANEY, FREEDMAN, SEITZ, VAN DUSEN, ALDISERT, ADAMS and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 In May of 1962 a judgment was entered in the United States District Court for the Eastern District of Pennsylvania against plaintiff Miller, based on his vicarious liability for the negligent driving of his truck by a sub-agent, whom his truck driver had permitted to drive. The accident took place in Maryland, and the judgment was in favor of a Maryland plaintiff. Because that judgment remained unsatisfied for sixty days, Pennsylvania suspended Miller's motor vehicle operator's license and his owner's registration. On June 10, 1963, he received a discharge in bankruptcy from the vicarious tort liability. On June 19, 1963, he requested the Secretary of Revenue of the Commonwealth to revoke the suspensions. The secretary declined. Miller then commenced this suit to enjoin the enforcement, as to him, of the Pennsylvania statute which provides for suspension of operator's license and owner's registration of persons against whom a motor vehicle accident judgment remains unsatisfied. He contends that the last paragraph of 1414 of the Pennsylvania Motor Vehicle Safety Responsibility Provisions, Pa.Stat.Ann. Tit. 75, 1414 (1960), is unconstitutional. That section provides:
 
 
 2
 A discharge in bankruptcy following the rendering of any such judgment shall not relieve the judgment debtor from any of the requirements of this article.
 
 
 3
 It must be read in conjunction with 1413 of the same statute which makes consent of the judgment creditor a necessary condition to restoration of license privileges. His suit presents the issue whether under the supremacy clause or the due process or equal protection clauses a state can impose, as a pre-condition to the right to own or to drive a motor vehicle, the satisfaction of a private debt, resulting from remote vicarious tort liability, that has been discharged in bankruptcy.
 
 
 4
 Miller, and the district judge to whom the case was assigned, requested a three-judge court. 28 U.S.C. 2281, 2284. In December, 1964, Chief Judge Biggs declined to convene such a court on the ground that the complaint failed to allege a substantial federal question. Miller v. Smith, 236 F.Supp. 927 (E.D.Pa.1965). In October, 1965, the Supreme Court denied Miller's motion for leave to file a petition for a writ of mandamus challenging Judge Biggs' ruling. The case then proceeded to hearing before a single district judge, who on October 2, 1969 ordered that the Commonwealth authorities revoke their suspension of Miller's operator's license and owner's registration. This appeal followed.
 
 
 5
 When Mr. Miller undertook his quest for the right to use a car to earn a living, it was clear that only a three-judge court could enjoin enforcement of an unconstitutional statute on supremacy grounds. Kesler v. Department of Public Safety, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962). Justice Warren dissented from that rule. Kesler v. Department of Public Safety, supra at 175, 82 S.Ct. 807. His view is now the law. A single district judge can issue or refuse to issue an injunction on supremacy grounds. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). The District Court reached its decision on Fourteenth Amendment grounds. Those grounds would still require a three-judge court and a direct appeal to the Supreme Court. But where, as here, the same facts, which are not in dispute, can support a decision on supremacy grounds we have jurisdiction to affirm.
 
 
 6
 The Commonwealth contends that Chief Judge Biggs' opinion in Miller v. Smith, supra has already decided the supremacy issue unfavorably to Miller. But whatever is the role of a Chief Judge of a circuit in considering whether or not to convene a three-judge court, it is clear that he could not make any decision on the merits on any issue. His opinion that the supremacy contention was frivolous because of the decision in Kesler v. Department of Public Safety, supra, that of a judge acting in the performance of a limited judicial function, is not controlling.
 
 
 7
 If Kesler v. Department of Public Safety, supra, and Reitz v. Mealey, 314 U.S. 33, 62 S.Ct. 24, 86 L.Ed. 21 (1941), relied upon in Kesler, were directly in point, we would be obligated to apply them to this case, whatever doubts we might have about their soundness. However, in the present distinguishable situation, we will not extend their holdings and thereby without sound reason further erode the healing remedy afforded by 17 of the Bankruptcy Act, 11 U.S.C. 35 (Supp. V, 1970).
 
 
 8
 Both Reitz and Kesler involved drivers of motor vehicles. In Reitz, the Supreme Court upheld the validity of 94-b of the Vehicle and Traffic Law of New York, as applied to a negligent driver. That statute imposed a three-year suspension on a driver who has had an accident in respect of which a judgment convicted him of negligence unless he furnished proof of ability to satisfy the judgment. Justice Roberts for the Court wrote:
 
 
 9
 If the statute went no further, we are clear that it would constitute a valid exercise of the State's police power not inconsistent with 17 of the Bankruptcy Act. The penalty which 94-b imposes for injury due to careless driving is not for the protection of the creditor merely, but to enforce a public policy that irresponsible drivers shall not, with impunity, be allowed to injure their fellows. The scheme of the legislation would be frustrated if the reckless driver were permitted to escape its provisions by the simple expedient of voluntary bankruptcy, and, accordingly, the legislature declared that a discharge in bankruptcy should not interfere with the operation of the statute. Such legislation is not in derogation of the Bankruptcy Act. Rather it is an enforcement of permissible state policy touching highway safety. Reitz v. Mealey, supra at 37, 62 S.Ct. at 27.
 
 
 10
 The Court expressly abstained from considering the further question whether an amendment to that statute, which put it in the power of the creditor to end the suspension by later exacting payment, was in conflict with 17 of the Bankruptcy Act, 11 U.S.C. 35 (Supp. V, 1970). Justice Douglas dissented, saying:
 
 
 11
 Under the New York scheme a creditor whose claim has been discharged still holds a club over his debtor's head. The state has given him a remedy which survives bankruptcy. If the bankrupt refuses to pay his discharged debt, the creditor will see to it that his driver's license is suspended. If, however, the bankrupt will pay up, the creditor will refrain.
 
 
 12
 The practical pressures of this collection device are apparent. Where retention of the operator's license is essential to livelihood, as here alleged, the bankrupt is at the creditor's mercy. Bankruptcy is not then the sanctuary for hapless debtors which Congress intended. The bankrupt, instead of receiving by virtue of his discharge 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt' (Local Loan Co. v. Hunt, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230, 93 A.L.R. 195) finds himself still entangled with a former creditor.
 
 
 13
 In practical effect the bankrupt may be in as bad, or even worse, a position than if the state had made it possible for a creditor to attach his future wages. Such a device would clearly contravene the Bankruptcy Act. Local Loan Co. v. Hunt, supra. The present one likewise runs afoul of the Act. Reitz v. Mealey, supra, at 41-42, 62 S.Ct. at 29.
 
 
 14
 Justice Douglas is quite obviously correct that the result of the New York statute (as well as the Pennsylvania statute before us and all the other motor vehicle financial responsibility statutes) is to put in the hands of a judgment creditor a club to enforce payment of reparations for a tort claim.
 
 
 15
 Kesler brought before the Supreme Court the question reserved in Reitz. In the opinion of the Court, Justice Frankfurter made an exhaustive study of the legislative history of motor vehicle responsibility laws. He did not discuss, however, the legislative history of 17 of the Bankruptcy Act, 11 U.S.C. 35 (Supp. V, 1970) though that history would have afforded a helpful guide to the decision of a supremacy question. Justice Frankfurter explained Reitz v. Mealey, supra, as the upholding of the 'police power' of a state 'exerted for the protection of life and limb.' Kesler v. Department of Public Safety, supra, 369 U.S. at 172, 82 S.Ct. at 819. That is, indeed, what Justice Roberts said. It was once argued (and is occasionally still) that a statute making automobile liability insurance compulsory has an adverse impact on safe driving by relieving tortfeasors of the consequences of their negligence. But any driver knows that neither type of statute bears any meaningful relationship to his driving habits or the protection of life and limb. Both are devices adopted to spread the risk of the statistically predictable and inevitable number of injuries resulting from motor vehicle operation.
 
 
 16
 Even accepting the fiction that, as applied to drivers, motor vehicle responsibility statutes are intended to promote safety, it is just too much fiction to contend that, applied to a judgment debtor held vicariously liable for the omission of a sub-agent, the statute is anything but a means for the enforcement of judgments. Indeed, the effect of the Pennsylvania law in Miller's case is not to prevent a careless person from driving, but to leave Miller no option other than to continue to let others do his driving, the very procedure that resulted in the accident as a result of which his driver's permit has been revoked. Therefore, we think that Reitz and Kesler, which dealt only with judgments against negligent drivers, have no rational application to persons held vicariously liable. As to such drivers, the Pennsylvania statute conflicts with 17 of the Bankruptcy Act, 11 U.S.C. 35 (Supp. V, 1970).
 
 
 17
 In the opinion of the Court in Kesler Justice Frankfurter wrote:
 
 
 18
 Utah is not using its police power as a devious collecting agency under the pressure of organized creditors. Victims of careless car drivers are a wholly diffused group of shifting and uncertain composition, not even remotely united by a common financial interest. The Safety Responsibility Act is not an Act for the Relief of Mulcted Creditors. It is not directed to bankrupts as such. Though in a particular case a discharged bankrupt who wants to have his rightfully suspended license and registration restored may have to pay the amount of a discharged debt, or part of it, the bearing of the statute on the purposes served by bankruptcy legislation is essentially tangential. Kesler v. Department of Public Safety, supra, at 174, 82 S.Ct. at 819.
 
 
 19
 That paragraph constitutes most of the analytical treatment by the Supreme Court majority of the supremacy issue in either Reitz or Kesler.
 
 
 20
 Two points seem to be involved in that analysis. The first is that motor vehicle tort claimants are for purposes of the Bankruptcy Act different from organized commercial creditors. The second is that deprivation of the right to own or operate a motor vehicle, for the purpose of exacting payment of a discharged debt, impinges only tangentially on the purposes served by the Bankruptcy Act. Were we to accept both points as bases for decision, we would be justified in extending the holdings of Reitz and Kesler to Miller's situation as other circuits have done. See, e.g., Perez v. Campbell, 421 F.2d 619 (9 Cir. 1970), cert. granted, Oct. 12, 1970, 400 U.S. 818, 91 S.Ct. 71, 27 L.Ed.2d 45, and cases therein cited. But believing neither point is valid, we confine the holdings of Reitz and Kesler to their facts.
 
 
 21
 The first point, that there is a distinction between organized creditors or mulcted creditors on the one hand, and motor vehicle tort claimants on the other, would apply equally to any tort claimants. This being the case, state legislation designed to enforce the collection, after discharge in bankruptcy, of any tort judgments could theoretically be justified so long as the state found some tenuous safety rationalization for the device. Miller, for example, operated a restaurant, for which his motor vehicle was picking up provisions at the time of the accident. Suppose his chef had left a clam shell in the clam chowder, and a diner broke a tooth; and suppose further that a state statute provided for revocation of Miller's and the chef's 'license' to engage in the restaurant trade until the resulting judgment was paid. Nothing in the language or history of the Bankruptcy Act suggests that such a statute would be effective in the face of a discharge. In fact, both language and history point to the opposite conclusion.
 
 
 22
 Justice Frankfurter's references in Kesler, supra, 369 U.S. at 174, 82 S.Ct. at 819, to the 'pressure of organized creditors' and to 'victims of careless car drivers * * * not even remotely united by a common financial interest' suggest an underlying assumption that bankruptcy relief is in the United States intended for the rehabilitation of commercial traders rather than individuals. In footnote 38 he makes this assumption even clearer, when he speaks of the 'enormous increase in nonbusiness bankruptcy cases in recent years.' Kesler, supra at 173, 82 S.Ct. at 819.
 
 
 23
 Of course there has been such an enormous increase, because there has been an enormous increase in the number of situations in which individuals have needed the benefits of the fresh start afforded by a discharge. Excessive credit for automobile purchases is one reason for the increase. Increased highway congestion, and the inevitable consequence of highway accidents, is another reason. Nothing in the language or history of 17 suggests that the consequences of these reasons as they affect individuals are in a different category from reasons for bankruptcy affecting traders.
 
 
 24
 It took until 1898 for Congress to implement Article I, 8, Clause 4 of the Constitution, by the enactment of permanent bankruptcy legislation. Act of July 1, 1898, ch. 541, 1-70, 30 Stat. 544. In almost every Congress from the First the subject was debated, and those debates, in which over the years the representatives of various sectional and economic interests changed positions, usually centered around two major issues: voluntary bankruptcy and individual bankruptcy. The history of successive enactments and repeals, and the congressional debates thereon, are set forth in detail by Charles Warren in Bankruptcy in United States History (1935). When, in 1898, the 55th Congress enacted the law which has been virtually unchanged since, it provided for voluntary bankruptcy, for individual bankruptcy, and for the discharge of all provable debts. Provable debts did not include unliquidated tort claims, Schall v. Camors, 251 U.S. 239, 40 S.Ct. 135, 64 L.Ed. 247 (1920), but included tort judgments, Lewis v. Roberts, 267 U.S. 467, 45 S.Ct. 357, 69 L.Ed. 739 (1925). The law has never been otherwise since 1898, and there is no basis in the statute or the case law up to Kesler for the distinction suggested by Justice Frankfurter between 'victims of careless car drivers' and 'organized creditors.' Kesler, supra 369 U.S. at 174, 82 S.Ct. 807.
 
 
 25
 Indeed in Miller's case any such distinction, even if it were justified by 17, would blur because Miller was in business and he voluntarily surrendered his business and personal assets, such as they were, for division among his trade creditors and the victims of his subagent's negligence. Such, we suspect, will frequently be the case where a tort judgment is the result of vicarious liability.
 
 
 26
 Nor is the disability of disqualification from owning or operating a motor vehicle an essentially tangential impingement upon the purposes served by 17 of the Bankruptcy Act, 11 U.S.C. 35 (Supp. V, 1970). One cannot ignore the facts of present-day urban existence. A combination of public and private policies have made use of an automobile an actual necessity for virtually everyone who must work for a living. For the urban poor, in particular, remoteness from the thriving suburban segment of the industrial economy and a deteriorating public transportation system often make use of an automobile the only practical alternative to welfare. There is, of course, the choice of insuring adequately. But for the same urban poor the skyrocketing cost of automobile insurance, for which they pay higher premiums than their more affluent suburban neighbors, often makes that alternative impractical. After judgment the uninsured motorist feels the heavy hand of criminal sanctions for driving on the revoked list, Pa.Stat.Ann. Tit. 75, 624(6) (Supp., 1969), as an encouragement to sharing his earnings with his creditor. Today the freedom of action of such a person is almost as effectively circumscribed as was that of Robert Morris when, after the panic of 1797, he was imprisoned for debt in Prune Street Jail in Philadelphia. Morris was released from jail by virtue of the shortlived Bankruptcy Act of 1800.[1] Many unfortunate judgment debtors can never be restored to the freedom of motion and economic opportunity for which, today, use of an automobile is essential. We decline to enlarge their number by reading the Reitz and Kesler decisions more broadly than is compelled by their exact holdings.
 
 
 27
 We hold that, applied to Miller, 1414 of the Pennsylvania Motor Vehicle Safety Responsibility Provisions, Pa.Stat.Ann. Tit. 75, 1414 (1960), conflicts with 17 of the Bankruptcy Act, 11 U.S.C. 35 (Supp. V, 1970). On that basis the judgment of the district court will be affirmed.
 
 GANEY, Circuit Judge (dissenting):
 
 28
 I would reach decision here preliminarily, before proceeding to the merits of the case, as my colleagues in the majority have done.
 
 
 29
 At the time the lower court was considering the complaint before it which alleged claims under the Civil Rights Act, 42 U.S.C. 1983, it is uncertain whether counsel for the plaintiff was permitted to orally amend the amended complaint to add a claim under the Fourteenth Amendment, as he contended at the hearing, for the record does not disclose any such procedure. However, it is certain from the lower court's opinion that it deemed the complaint averred, in addition to a specific violation of the Supremacy Clause, Article VI of the Constitution, a violation of the Due Process and Equal Protection provisions of the Fourteenth Amendment, for it was on the latter ground that it based its decision specifically stating that it was not passing on the question of a violation of the Supremacy Clause, and revoked the order of the Secretary of Revenue withdrawing the plaintiff's driver's license and owner's certificate. See rule 15(b) of the Federal Rules of Civil Procedure.
 
 
 30
 At this juncture of the case the lower court had neither power nor authority, alone, to pick and choose the grounds for its decision. It was mandated, when the alleged Supremacy Clause of the Constitution violation was asserted, and linked with a Fourteenth Amendment violation, to apply to the Chief Judge of this Circuit for the appointment of a three-judge court under 28 U.S.C. 2281. Swift & Co. v. Wickham, 382 U.S. 111, 125, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). Here, the Court held that unless the 'sole' ground alleged in the complaint was a violation of the Supremacy Clause, Article VI of the Constitution, it must be adjudicated by a three-judge court.
 
 
 31
 This holding is further buttressed by the later decision of the Supreme Court in Brotherhood of Locomotive Engineers v. Chicago, Rock Island & Pacific Railroad Co., 382 U.S. 423, 428, 86 S.Ct. 594, 596, 15 L.Ed.2d 501 (1966), wherein the Court upheld the authority of Swift & Co., supra, and stated, '* * * that an allegation that a state statute is pre-empted by a federal statute does not allege the unconstitutionality of the state statute so as to call for the convening of a three-judge court under 28 U.S.C. 2281. Thus, under Swift, the pre-emption issue in this case standing alone would not have justified a three-judge court, and hence would not have justified direct appeal to us under 28 U.S.C. 1253. The complaint here, however, also challenged the Arkansas statutes as being in violation of the Commerce, Due Process and Equal Protection Clauses. In briefs submitted to us after oral argument the appellants have argued that all these constitutional challenges are so insubstantial as a matter of law that they are insufficient to make this an appropriate case for a three-judge court. We cannot accept that argument. Whatever the ultimate holdings on the questions may be we cannot dismiss them as insubstantial on their face. Nor does the fact that the pre-emption issue alone was passed on by the District Court keep this from being a three-judge case.'
 
 
 32
 Accordingly, I hold that the district court, as I have indicated, had neither power, nor authority, to make disposition of the issues presented before it, to wit, a violation of the Supremacy Clause of the Constitution, Article VI, when linked with claims under the Due Process and Equal Protection provisions of the Fourteenth Amendment, and in so doing was clearly in error.
 
 
 33
 I would vacate the judgment of the lower court and remand the case to it with direction that application be made for the appointment of a three-judge court to the Chief Judge of this Circuit, pursuant to 28 U.S.C. 2281.
 
 VAN DUSEN, Circuit Judge (dissenting):
 
 34
 If Kesler v. Department of Public Safety, etc., 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962), and Reitz v. Mealey, 314 U.S. 33, 62 S.Ct. 24, 86 L.Ed. 21 (1941), are to be overruled, I believe the Supreme Court of the United States should take such action. The Pennsylvania statute challenged on supremacy clause grounds in this case is substantially similar in wording, operation, and effect to the Utah statute upheld in the face of a similar challenge in Kesler.[1] If a businessman such as plaintiff knows that his driving privileges will be lost if he has careless employees who permit careless drivers to drive his trucks,[2] the Commonwealth of Pennsylvania may legitimately believe that he will be more careful in selecting such employees and that there will be fewer accidents on its highways. Also, such threatened loss of driving privileges will tend to make the employer more careful when he drives the truck himself.[3]
 
 
 35
 I would vacate the October 1, 1969, district court order and remand the case to that court so that a three-judge court may be convened to consider plaintiff's Fourteenth Amendment contentions, in the event that the plaintiff makes the appropriate further amendment to the Complaint.
 
 
 
 [1]
 Charles Warren, Bankruptcy in United States History, supra at 20
 
 
 [1]
 Compare 75 P.S. 1401 ff. with Utah Code Ann., 1953, Tit. 41, c. 12. See Kesler v. Dept. of Public Safety, etc., 369 U.S. 153, 166 n. 30, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962)
 
 
 [2]
 In Maryland to Use of Ungolo v. Miller, 210 F.Supp. 193 (E.D.Pa.1962), the court noted:
 As part of his job Anderson made the trip to Grasonville 15 or 20 times previously. At a time previous to the accident, Anderson had discussed with Miller, his employer, the question of whether or not he could take someone with him to Grasonville for company. Miller made no comment, but he did not forbid it.
 
 
 [3]
 I cannot agree with the statement in the majority opinion at page 118 that 'any driver knows that neither type of statute bears any meaningful relationship to his driving habits or the protection of life and limb.' See Reitz v. Mealey, supra. Also, the denial in the Amended Answer of the allegations of paragraph 9 of the Amended Complaint leaves no factual basis for considering plaintiff as a member of the 'urban poor.' See page 120 of the opinion